IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE,<br>c/o Weil, Gotshal & Manges LLP<br>2001 M Street NW, Suite 600<br>Washington, DC 20036<br>　　　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>ANTONY BLINKEN,<br>Secretary of State of the United States,<br>Serve: Executive Office of the Office of the<br>Legal Adviser<br>U.S. Department of State<br>600 19th Street NW, Suite 5.600<br>Washington DC 20522,<br><br>　and<br><br>ALEJANDRO MAYORKAS,<br>Secretary of Homeland Security,<br>Serve: Office of the General Counsel<br>U.S. Department of Homeland Security<br>245 Murray Lane, SW<br>Mail Stop 0485<br>Washington, DC 20528-0485,<br><br>　and<br><br>UNITED STATES DEPARTMENT OF<br>HOMELAND SECURITY,<br>Serve: Office of the General Counsel<br>U.S. Department of Homeland Security<br>245 Murray Lane, SW<br>Mail Stop 0485<br>Washington, DC 20528-0485,<br><br>　and<br><br>UNITED STATES DEPARTMENT OF | Civil Action No.: |

STATE,
Serve: Executive Office of the Office of the
Legal Adviser
U.S. Department of State
600 19th Street NW, Suite 5.600
Washington DC 20522,

                              Defendants.

# COMPLAINT

Plaintiff John Doe, by and through undersigned counsel, alleges, upon knowledge as to himself and otherwise upon information and belief, as follows:

## INTRODUCTION AND SUMMARY

1. John Doe is an Afghan citizen who, as a young man living in war-torn Afghanistan, made the brave decision to serve as a translator and interpreter for the United States Army and the United States Marine Corps (the "U.S. Armed Forces") between 2008 and 2010. He was known as a dedicated and reliable colleague, earning praise for his bravery, commitment, and linguistic and cultural aptitude.

2. Because of his dedicated service to the U.S. Armed Forces, John Doe is a target of the Taliban, and his family has experienced threats and violence. One family member has even been tortured for information about John Doe's identity. The relief John Doe seeks is a matter of life and death for himself and his family, including his four young children, who escaped Afghanistan and now live in limbo as refugees, disconnected from their extended family and with constant fear and apprehension about their safety and future immigration status.

3. John Doe first applied for a Special Immigrant Visa ("SIV") in 2010, and the U.S.

government informed him that his document submission process was complete in 2017. He completed the required interviews and medical examinations in 2019. Nearly thirteen years since his original application, he continues to wait for a decision. John Doe now brings this action to compel the government to adjudicate his petition and put an end to its unreasonable delay.

## PARTIES

4. Plaintiff John Doe is an Afghan national who served the U.S. Armed Forces as a translator and interpreter from 2008 to 2010. John Doe is married and has four children.

5. Defendant United States Department of State is an agency of the United States federal government that, together with Defendant United States Department of Homeland Security, administers the SIV program for Afghans pursuant to Section 1059 of the National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163 § 1059 (Jan. 6, 2006) ("Section 1059").

6. Defendant Antony Blinken is the Secretary of State and exercises authority over the Department of State. Secretary Blinken, together with Defendant Secretary of Homeland Security Alejandro Mayorkas, is responsible for the administration of the SIV program for Afghans pursuant to Section 1059. Secretary Blinken is named as a defendant in his official capacity only.

7. Defendant Alejandro Mayorkas is the Secretary of the Department of Homeland Security. Secretary Mayorkas, together with Secretary Blinken, is responsible for the administration of the SIV program for Afghans pursuant to Section 1059. Secretary Mayorkas is named as a defendant in his official capacity only.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over all claims asserted against Defendants pursuant to 28 U.S.C. § 1331 (federal question), 5 U.S.C. §§ 701-06 (Administrative

Procedure Act), and 28 U.S.C. § 1361 (mandamus).

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because Defendants are federal agencies headquartered in the District of Columbia or officers of those agencies.

## THE SPECIAL IMMIGRANT VISA PROGRAM FOR AFGHANS

10. In 2006, in recognition of the brave service of Iraqi and Afghan nationals to the U.S. government, Congress created the Iraqi and Afghan Translator Program by enacting Section 1059. The NDAA authorized the Department of State to issue up to 50 SIVs each year to Iraqi and Afghan nationals who served as translators or interpreters with the U.S. military. That number was subsequently increased to 500 SIVs during fiscal years 2007 and 2008. Pub. L. No. 110-28 § 3812 (May 25, 2007). The current annual limit of SIVs pursuant to Section 1059 is 50 per year.

11. Under Section 1059, a person is eligible for an SIV if they: a) are a citizen or national of Iraq or Afghanistan; b) have worked directly with U.S. Armed Forces or under Chief of Mission authority as a translator for a period of at least 12 months; c) provide a written favorable recommendation from a general or flag officer in the chain of command of the U.S. Armed Forces unit that they supported, or if employed under Chief of Mission authority, the Chief of Mission in Iraq or Afghanistan; d) clear a background check and screening; and e) are otherwise admissible. Pub. L. No. 109-63 § 1059, as amended by Public Law 110-242.

12. To apply for an SIV, the applicant must file an I-360 Petition and required documentation (available at http://www.uscis.gov/i-360) at the U.S. Citizenship and Immigration Services ("USCIS") Nebraska Service Center (NSC). If a review of the petition by NSC is favorable, the NSC sends a conditional approval letter to the applicant. The NSC also forwards the conditional approval to the National Visa Center (NVC), located in New Hampshire.

13. The NVC then notifies the applicant to file a visa application form (Form DS 260) and submit additional civil documents to the NVC. The applicant's spouse and unmarried children

under the age of 21 also are entitled to receive SIVs as derivatives of the principal applicant and, as such, must also file the Form DS 260 and supporting documentation. This stage is referred to as "applicant document processing" and must be completed before the State Department will schedule an applicant's visa interview. For Afghan applicants, the documents that must be submitted along with the DS 260 include: a copy of the biodata page from the passport; a copy of the Taskera or birth certificate; a copy of the marriage certificate (for spouses); recent photographs; and resettlement benefits election form.

14. After the NVC has processed the visa application and supporting documents, it informs the applicant via an "appointment letter" that a visa interview has been scheduled. All family members on the application must attend the interview.

15. After the interview, the applicant and accompanying family members are required to complete medical exams at their own expense before their visas are issued. These medical exams are only valid for six months.

16. The final step is administrative processing that includes security checks. This screening involves multiple government agencies. During this stage, the applicant's file status is listed as "administrative processing." Upon completion of the security checks, a visa is issued. Any time before admission, the application could be moved back to a prior stage of review.

17. Section 1059 currently authorizes the Department of State to issue up to 50 visas per year. The 50-visa limit was not reached in 2019, 2020, 2021, or 2022.

**PLAINTIFF JOHN DOE'S BACKGROUND**

A. **John Doe's Commendable Service on Behalf of the U.S. Government**

18. Between 2008 and 2010, John Doe served as a translator and interpreter for the U.S. Army, U.S. Marine Corps, and U.S. Special Forces.

19. John Doe worked in intensely stressful, high-pressure conditions during wartime.

His duties included serving as an interpreter for interrogations of detainees; translating intelligence gathered from the Taliban; interpreting Taliban radio chat in real time; and interpreting at medical clinics. John Doe also used his language skills and knowledge of Afghan culture to help the United States' mission and relationships with contractors and local communities.

20. John Doe received consistently excellent reviews from supervisors. His record of service to the United States is spotless.

21. For example, the Platoon Commander for a unit John Doe served with (a First Lieutenant in the U.S. Marines) wrote in his recommendation letter that John Doe "has been an integral part of this platoon for the duration of his time spent with us. [John's] mastery of the English language and his in depth knowledge of the Afghan culture makes him a perfect candidate for interpreting. Furthermore you will not find a more energetic or hard working linguist in the battalion. He has volunteered to go on every single patrol that the platoon has conducted, and every success we have had can in one way or another be attributed to [John's] presence on these patrols. His patrolling techniques are very advance[d] and he has proven that he can stay calm and controlled in situation[s] where most linguists do not. Furthermore [John] has proven that he chooses to serve the US Marine Corps not for the pay but because he has a genuine interest in making Afghanistan a b[e]tter place. After working with [John], it has become clear that his abilities would be useful as linguist at any level of operation in the war on terror. He would be a great help to any [coalition] force unit[] that he attached to. [John's] work ethic and attitude separate him from all other linguist[s] that this platoon has worked with. He is a genuine friend of this platoon and we hope to see him prosper in an area that would b[e]tter suit his abilities. I submit with great emphasis that [John Doe] is an honest and reliable linguist and recommend that he be considered for US citizenship."

22. The Director of Operations for the International Security Assistance Force Regional Command South (a Brigadier General of the U.S. Army) wrote in his recommendation letter that John Doe "has served as a personal interpreter for the United States Armed Forces in Afghanistan, working with Americans in various capacities. [John Doe] has been a loyal and dedicated interpreter for [region] and the U.S. Army. … This [visa] program was designed for exceptional people like John Doe, who have risked their lives to support United States Armed Forces in Afghanistan. [John Doe] has diligently supported [Region] as an interpreter and translator. His efforts have contributed immensely to the United States Armed Forces and saved soldiers['] lives."

23. A Company Executive Officer for another unit John Doe supported (a First Lieutenant of the U.S. Marines) wrote in his recommendation letter that John Doe "provided consistent linguist services support of [his Company]…. While operating in the [region], [John Doe] participated in over 400 dismounted patrols and was utilized at vehicle and entry control points, ensuring that cultural differences and language barriers in no way hampered the mission of the unit, or degraded the safety of the Marines or civilian personnel in the area."

B. **Threats and Violence to John Doe and his Family Because of his Dedicated Service to the U.S. Government**

24. John Doe's brave service to the U.S. Armed Forces came at significant cost to him and his family.

25. In 2008, a close relative of John Doe's was captured and tortured by the Taliban for three days. Before the relative was brutally murdered by the Taliban, the relative, during the course of the torture, revealed John Doe's location and identity as an interpreter for the United States.

26. Between 2008 and 2010, John Doe and his family received direct threats by phone and at their door from the Taliban.

27. John Doe has a genuine belief, corroborated by fellow Afghan refugees and U.S.

military service members with whom John Doe has interacted, that if John Doe is forced to return to Afghanistan, threats on his life will continue.

28. During the summer of 2015, the Taliban executed a series of devastating bombings in the capitol region of Afghanistan, including an attack on the Parliament. *See* "Taliban attack Afghanistan's parliament," Reuters (June 22, 2015), https://www.reuters.com/article/cnews-us-afghanistan-blast-idCAKBN0P20FM20150623. The Taliban also made significant territorial gains, and counter-terrorism efforts struggled to cope. *Id.* The swift and dangerous uptick in killings that summer, including hundreds of civilian casualties, increased Afghanis' genuine fear for their lives. *See* Afghan Taliban, Counterterrorism Guide, Director of National Intelligence, https://www.dni.gov/nctc/groups/afghan_taliban.html ("The Taliban between 7 and 10 August 2015 conducted a series of attacks in quick succession in Kabul that resulted in at least 60 deaths, marking the deadliest stretch in the capital since the US-led invasion in 2001.").

29. In October 2015, as the situation in Afghanistan was growing increasingly dangerous for John Doe, he escaped the country. Along with other refugees from Afghanistan, Syria, and Iran, John Doe traveled for months by foot, in vans, and on trucks and ferries through Iran, Turkey, Greece, Macedonia, Serbia, Croatia, Slovenia, and Austria, until he arrived in Germany at the end of 2015. He stayed in refugee camps along the way and was sometimes assisted by UNHCR, which organized documents permitting the refugees to pass from one country to another. He remained in Germany, staying in refugee camps and awaiting asylum status in Germany. After five years of uncertain immigration status in Germany, John Doe applied for asylum status in the Netherlands and obtained a temporary resident permit there.

30. In October 2020, John Doe moved to the Netherlands and was housed in a refugee camp for 10 months. His family joined him in the Netherlands in March 2021, after having been

separated for 6 years.

## **DEFENDANTS' UNREASONABLE DELAY IN ADJUDICATING JOHN DOE'S SIV APPLICATION**

31. John Doe applied for a Special Immigrant Visa on April 2, 2010. He submitted to USCIS his Form I-360 and supporting documents, including letters of recommendation from his direct supervisors.

32. On October 15, 2015, USCIS conditionally approved the petition and instructed John Doe to file a visa application form (DS-260) and additional civil documents with the NVC. *See* Exhibit B. At the time, John Doe did not have access to all of his civil documents because he was in Istanbul, in the process of escaping Afghanistan for his safety.

33. On July 27, 2016, John Doe submitted his visa application and all required documentation to the NVC, and received confirmation from the U.S. Consular Electronic Application Center that his submission was successful.

34. On October 26, 2016, NVC notified John Doe in writing that his documentation was complete.

35. On May 22, 2017, NVC emailed John Doe, stating, "Visa interview appointments are scheduled based on the date the petition was filed, and the date when the cases are documentarily complete. Therefore, your case will be scheduled in the order it was filed. We will contact you via e-mail when a visa number becomes available and we can schedule a visa interview appointment for you."

36. On or about May 25, 2017, NVC emailed John Doe, stating that the NVC "received your approved Special Immigrant Visa petition" and provided instructions for how to submit documents to the NVC.

37. On April 16, 2019, the U.S. Consulate in Frankfurt emailed John Doe, stating, "Our

9

office will request a visa number [on] your behalf[.] Upon receipt we will schedule the interview and inform you accordingly[.] The visa number should arrive for the month of May or June 2019." *See* Exhibit F. On May 2, 2019, the U.S. Consulate in Frankfurt emailed John Doe stating that his visa interview was scheduled for May 13, 2019.

38. John Doe attended and completed his visa interview on May 13, 2019.

39. On November 8, 2019, the U.S. Consulate in Frankfurt emailed John Doe to inform him that they were "ready to begin final processing of the immigrant visa applicant(s)." *See* Exhibit H. The email directed John Doe to schedule a medical examination. John Doe promptly submitted his completed medical exam on November 14, 2019.

40. At that point, John Doe should have received a final determination of his visa application. Instead, for more than two years, John Doe never received any information about the status of his visa application from the U.S. Consulate in Frankfurt, other than perfunctory and automated email messages that John Doe's case was still being reviewed.

41. On July 12, 2021, following John Doe's move to the Netherlands, his visa application file was transferred from Germany to the Netherlands.

42. After John Doe's case was transferred to the Netherlands, his attorney repeatedly contacted the U.S. Consulate in the Netherlands but mostly received automated, non-substantive responses. In addition, on September 1, 2021, John Doe's attorney initiated a Congressional inquiry with Congressman Mondaire Jones' office. The Consulate's responses to the Congressman were often delayed and referred to how short-staffed the office was.

43. John Doe has now waited thirteen years since he applied for his SIV and more than six years since his application documentation was deemed complete to have his SIV application adjudicated.

## HARM TO JOHN DOE DUE TO DEFENDANTS' UNREASONABLE DELAY

44. Defendants' unreasonable delay has inflicted grave harm on John Doe and his family, which continues today.

45. John Doe has experienced severe mental anguish, including depressive episodes and periods of anxiety that have led to sleepless nights despite taking sleep medication.

46. John Doe and his family have also experienced harm due to family separation. They are stuck in limbo as they await the adjudication of their visa application, unable to return to Taliban-controlled Afghanistan and unable to continue on to the United States, where some of their other family members reside. John Doe's wife, Jane Doe, has now been separated from her parents and siblings—who escaped Afghanistan to become residents in the United States—for more than eight years.

47. The most acute harm to John Doe and his family is their impending deportation to Taliban-controlled Afghanistan and their fear of same. As refugees, they are only permitted to live in the Netherlands temporarily with five-year resident permits, which expire on September 26, 2024. Extension of the resident permit is virtually impossible. Extension requires that John and Jane Doe attend classes to pass "integration exams," including written and oral proficiency of Dutch. John Doe, a skilled linguist, has struggled with Dutch proficiency despite consistent effort. Jane Doe is not literate in her native language, let alone Dutch. Extension also requires that John Doe secure employment, which he has been unable to do despite his best efforts.

48. John Doe's identity and service to the United States Armed Forces are known to the Taliban, and the Taliban has already acted on threats to John Doe's close relative. If John Doe and his family are deported to Afghanistan, they will face certain harm from the Taliban.

49. The Taliban has made the persecution of interpreters known. It is well documented that Afghan nationals who served the United States live in "constant fear," seeing as "they've

never been more vulnerable" to execution by the Taliban. "An Afghan Interpreter Who Helped the U.S. Military Is Now a Target for the Taliban," NPR (Aug. 16, 2021), https://www.npr.org/2021/08/16/1028016074/an-afghan-interpreter-for-the-u-s-army-is-trying-to-get-out-of-afghanistan. One nonprofit organization, No One Left Behind, reports that 300 Afghan interpreters and their family members have been killed since 2001 because of their work for the U.S. Armed Forces. *Id.* And gruesome stories about the fates of former interpreters abound. For example, on May 12, 2021, the Taliban stopped a former translator at a traffic checkpoint and beheaded him. *See* "Afghan Interpreter for US Army Was Beheaded," CNN (July 23, 2021), https://www.cnn.com/2021/07/22/asia/afghanistan-interpreters-taliban-reprisals-intl-hnk/index.html.

## CLAIMS FOR RELIEF

### Count One: Violation of the Administrative Procedure Act
### (Against All Defendants, Pursuant to 5 U.S.C. § 706(1))

50. John Doe incorporates by reference all of the allegations set forth above as if fully set forth below.

51. The Administrative Procedure Act obligates Defendants to "proceed to conclude a matter presented to [them]" within a "reasonable time," 5 U.S.C. § 555(b), and provides that courts "shall . . . compel agency action "unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1).

52. Defendants have a non-discretionary duty to adjudicate applications for a Special Immigrant Visa pursuant to Section 1059 of the National Defense Authorization Act (NDAA) for Fiscal Year 2006. Pub. L. No. 109-163 § 1059 (Jan. 6, 2006). Federal regulations require a consular officer to either issue or refuse the visa. *See* 22 C.F.R. § 42.81(a).

53. Defendants have failed to fulfill their non-discretionary duty to adjudicate John Doe's application for a SIV within a reasonable time.

54. Considering relevant factors such as (i) Congress' intent to facilitate visas for translators and interpreters who faithfully provided valuable service to U.S. Armed Forces, (ii) the scope and extent of the interests harmed by Defendants' delay, including the health and welfare of John Doe, his wife and four children, and (iii) the lack of evidence that expediting the agency's action would harm competing priorities, Defendants' delay is unreasonable in this case. *See Telecomms. Rsch. & Action Ctr. v. Fed. Commc'ns Comm'n*, 750 F.2d 70, 80 (D.C. Cir. 1984). Nor would granting relief cause John Doe to jump a queue of similarly situated petitioners, given the sheer length of time that has passed since he filed his SIV application. *See Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003).

55. Defendants' failure to adjudicate and process John Doe's SIV application in the more than six years since his application was deemed complete and the close to four years since he completed his interview and medical examination constitutes an agency action unlawfully withheld or unreasonably delayed in violation of 5 U.S.C. § 706(1).

**Count Two: Mandamus to Compel Officers and Agencies of the United States to Perform a Duty Owed to John Doe (Against All Defendants, Pursuant to 28 U.S.C. § 1361)**

56. John Doe incorporates by reference all of the allegations set forth above as if fully set forth below.

57. Mandamus is available to compel a federal official or agency to perform a duty if (1) there is a clear right to the relief requested; (2) defendant has a clear, non-discretionary duty to act; and (3) there is no other adequate remedy available. *See* 28 U.S.C. § 1361.

58. John Doe falls within the zone of interests of Section 1059 in that he worked as a translator and interpreter for the U.S. Armed Forces and fled Afghanistan because his life was in danger due to his service.

59. John Doe has a clear right to the relief sought. John Doe has met the requirements for a Special Immigrant Visa pursuant to Section 1059. USCIS conditionally approved his SIV application, and the U.S. Consulate in Frankfurt, Germany conducted a visa interview for him and instructed him to conduct his medical examination, which he promptly did.

60. Defendants have a non-discretionary duty to adjudicate applications for a Special Immigrant Visa pursuant to Section 1059. Federal regulations require a consular officer to either issue or refuse the visa. *See* 22 C.F.R. § 42.81(a).

61. Defendants have failed to fulfill their non-discretionary duty to adjudicate John Doe's application for a Special Immigrant Visa within a reasonable time. Federal agencies, including Defendant Department of State, are required to conclude matters presented to them within a "reasonable time." 5 U.S.C. § 555(b).

62. John Doe has brought this action because he has no other means to compel Defendants to perform the non-discretionary duty that Defendants owe John Doe.

**PRAYER FOR RELIEF**

For the foregoing reasons, Plaintiff John Doe respectfully requests that this Court:

A. Issue judgment pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(1), compelling Defendants to adjudicate John Doe's application for Special Immigrant Visa within fourteen (14) days from the issuance thereof;

B. Issue a mandamus pursuant to 28 U.S.C. § 1361 directing Defendants to adjudicate John Doe's application for Special Immigrant Visa within fourteen (14) days from the issuance

thereof;

C.    Retain jurisdiction over this action and any attendant proceedings until Defendants have fully and completely adjudicated John Doe's application for Special Immigrant Visa and communicated the results of such adjudication to John Doe and the Court;

D.    Award John Doe his attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

E.    Award John Doe such other relief as the Court deems just and proper.

Respectfully submitted, this 10th day of October, 2023.

>    */s/  Megan A. Granger*
>    Megan A. Granger
>    D.C. Bar No. 1010391
>    **WEIL, GOTSHAL & MANGES LLP**
>    2001 M Street, NW Suite 600
>    Washington, D.C. 20036
>    Telephone: (202) 682-7000
>    Fax: (202) 857-0940
>    megan.granger@weil.com
>
>    *Counsel for Plaintiff*